**AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT AND
SEARCH WARRANT**

I, Cormac Frost, being duly sworn, state the following:

**INTRODUCTION**

1.      I am an "investigative or law enforcement officer" within the meaning of 18
U.S.C. § 2510(7); that is, an officer of the United States empowered by law to conduct
investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2.      I am assigned to the Homeland Security Investigations ("HSI") Boston Field
Office and have been employed by HSI since 2019. I am assigned as a criminal investigator in
the Cyber Crimes Group. This group is responsible for conducting investigations into criminal
organizations who seek to exploit technology to promote their criminal activities. My
responsibilities include preventing the illegal importation of contraband into the United States as
well as the seizure of illicit proceeds used to support criminal organizations.

3.      Prior to my employment with HSI, I worked as an Agent with the United States
Border Patrol for approximately three and a half years where my responsibilities included the
interdiction of illegal border crossers, people with no legal right to enter or remain in the United
States, and controlled substances. I have a bachelor's degree in computer science.  I Federal Law
Enforcement Training at Centers located in Artesia, New Mexico and Glynco, Georgia. I am a
graduate of the U.S. Border Patrol Academy, the Criminal Investigator Training Program, and
the Homeland Security Investigations Special Agent Training program. Over the course of these
trainings, I received training on the investigation of transnational drug smuggling, distribution,
and other crimes related to controlled substances.

4.      As a HSI Special Agent, I am authorized to investigate violations of the laws of
the United States, including violations of 21 U.S.C. § 841 (possession with intent to distribute

1

and distribution of controlled substances) and 21 U.S.C. § 846 (conspiracy to possess with intent to distribute and to distribute controlled substances).

5.     I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and the debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I am familiar with the benefits and limitations of these techniques.   I have reviewed recorded conversations as well as telephone and financial records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.

6.     Through experience and training, I have become familiar with the types and amounts of profits made by drug traffickers and the methods, language, and terms used to disguise illegal activity. I know that persons engaged in drug trafficking require expedient forms of communication to maintain an adequate and consistent supply of drugs from sources, and to effectively market those drugs to customers.

7.     Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store, and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds. I am familiar with the manner in which drug traffickers use telephones, coded or slang-filled telephone conversations, text messages, pager messages, and other means to facilitate their illegal activities.

## PURPOSE OF THE AFFIDAVIT

8.     I submit this affidavit in support of the following:

a.  An application for a criminal complaint charging John Kirk COSTELLO
("COSTELLO") with violations of 21 U.S.C. § 841 (possession with intent to
distribute and distribution of controlled substances) (the "Target Offense") and
corresponding arrest warrant; and

b.  An application for warrants to search the residence of COSTELLO, located at 826
Willard Street, Apt 205, Quincy, MA, as described in Attachment A-1, and his
person, because there is probable cause to believe that they contain evidence,
fruits, and instrumentalities of the Target Offense, as described in Attachment B.

9.  I am the case agent for this investigation and have worked closely with other HSI
Special Agents (SA) and other law enforcement personnel.  Accordingly, I am familiar with the
facts concerning this investigation.  The facts in this affidavit come from my personal
observations, my training and experience, and information obtained from other agents/officers
and witnesses.  This affidavit is intended to show that there is probable cause for the criminal
complaint and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

### Background of Investigation

10.  HSI, DEA Special Agents/Task Force Officers (TFO), and assisting law
enforcement officers have been investigating a drug trafficking organization ("DTO") which is
involved in distributing counterfeit Adderall pills, which are laced with methamphetamine. The
investigation has included, among other things, the use of physical surveillance, debriefs of
confidential sources, controlled purchases of multi-hundred pill quantities of suspected
methamphetamine-laced pills by confidential sources and undercover officers, review of

commercial database records and registry of motor vehicle records, and telephone "toll" record analysis.

A. Controlled Purchase of 1,000 Counterfeit Adderall Containing Methamphetamine

11.     On October 26, 2020, HSI Special Agent Stephen Valentine and I met with a Cooperating Witness[1] (hereafter CW1) who provided information that COSTELLO works for Fred DECHRISTOFORO. CW1 stated that DECHRISTOFORO presses and sells pills including a mixture of Adderall and methamphetamine. CW1 stated that COSTELLO is Fred's trusted guy and in charge of handling big deals.

12.     Based on recorded conversations between COSTELLO and a CW1, I am aware that COSTELLO[2] uses the phone number (617) 447-7235 (hereafter "Target Phone 1") to facilitate COSTELLO's drug trafficking activities.[3]

13.     I have monitored and reviewed numerous calls and text messages between COSTELLO, the user of Target Phone 1 and CW1. During some of these communications, COSTELLO has discussed the sale of pills including the price he pays, the price for which he will sell pills, people he has sold pills too, and the quality of the pills.

---

[1] CW1 is cooperating with law enforcement for consideration in connection with criminal charges. CW1 has had multiple contacts with law enforcement including convictions for Carrying a dangerous weapon, Breaking and Entering, Possession of Class E Controlled Substance, Minor Possessing Alcoholic Beverage, Possession of Electronic Weapon/Stun Gun, Operating Negligently, Shoplifting, Armed Robbery, Knowingly Receiving Stolen Property, Identity Fraud, Conspiracy, Credit Card Misuse, Larceny, Possession of Class C Controlled Substance, Possession of Class B Controlled Substance. I have observed that CW1 has provided accurate and reliable information.

[2] COSTELLO's criminal history includes five (5) adult arraignments including: Minor transporting Alcohol, Resisting Arrest, Operating Negligently, Operating Under Influence of Liquor, and Attempt to commit a crime.

[3] Subscriber records obtained from T-Mobile show that Target Phone 1 is subscribed in the name of John COSTELLO.

14.     For example, in a recording of a consensually monitored phone call captured on December 7, 2020, between CW1 and Target Phone 1, COSTELLO stated, among other things: the last batch of pills was spotty; to his knowledge the pills are still "Tina"; and that wet "Tina" can cause the pills to be spotted. In my training and experience, by way of these statements, COSTELLO is explaining that he is aware that the pills contain methamphetamine, or "tina," and that the methamphetamine can cause the pills to have a spotty appearance. COSTELLO further made additional statements about wanting to deal with fewer customers and about how much money COSTELLO believed "Fred" (DECHRISTOFORO) had made selling Ads (Adderall). COSTELLO also talked about a man who buys Adderall for his wife, who asked that they mix in some placebos because she is taking too many and COSTELLO mentioned a neighbor that lives above him to whom he sells Adderall pills.

15.     Acting at the direction of law enforcement, in or around January 2021, CW1 coordinated with COSTELLO, who was using Target Phone 1, for the purchase of approximately 1,000 pills of a suspected Adderall/methamphetamine mixture for $3,400.00 dollars. During those communications, which were recorded, CW1 told COSTELLO, in sum and substance, that CW1 would be introducing a buyer to COSTELLO. The buyer was an undercover HSI TFO (hereafter UC). The controlled purchase was set for January 13, 2021.

16.     On January 13, 2021, at a predetermined location, I briefed other law enforcement personnel about the controlled purchase and met with the UC and CW1. I provided the UC with three thousand five hundred ($3,500) U.S. dollars in one hundred-dollar bills and audio recording and transmitting devices. I showed the UC a photo of COSTELLO. I provided a vehicle for the UC and CW1 to drive to the purchase location which was equipped with audio and video recording devices. Prior to the UC and CW1 driving to the purchase with COSTELLO, I

5

performed a search of the vehicle. CW1 consented to a pat down and I performed a search for weapons of CW1.

17.    At approximately 12:51 p.m. that day, during a recorded call between Target Phone 1 and CW1, COSTELLO chose a meeting location of Whole Foods on Derby Street in Hingham. At approximately 12:59 p.m., the UC and CW1 departed the predetermined meeting location and drove to Whole Foods. At approximately 1:17 p.m., SA Dale Gargac observed COSTELLO inside a 2005 Gray Honda Accord Sedan bearing Massachusetts registration "2PWD74"[4] at the Whole Foods. At approximately 1:22 p.m. COSTELLO, using Target Phone 1, texted CW1, "Here" and CW1 replied to COSTELLO, "On the side." COSTELLO texted, "Walking into there go to bathroom" and "Straight all the way to other side of store." COSTELLO then got out of the vehicle and walked into the Whole Foods.

18.    While the UC and CW1 were walking to the store, the UC notified other law enforcement personnel through the audio recording and transmitting devices that the license plate of COSTELLO's car was "2PWD74." Once inside, the UC and CW1 entered the bathroom where COSTELLO sold approximately 1,000 pills of a suspected Adderall/methamphetamine mixture to the UC in exchange for $3,400.

19.    At approximately 1:30 p.m., COSTELLO, the UC, and CW1 walked out of Whole Foods. The UC and CW1 drove away from the Whole Foods at approximately 1:32 p.m. SA Brendan Cullen and I followed the UC and CW1 back to the predetermined meeting location. At the predetermined location, the UC gave me the rolled up white USPS envelope they received from COSTELLO along with one (1) one-hundred-dollar bill of unused purchase funds. At

---

[4] MA license plate 2PWD74 is registered to John K COSTELLO of 826 Willard St, Apt 205, Quincy, MA 02169.

approximately 1:53 p.m., I performed a second pat down of CW1 no weapons were found[5] and CW1 left at approximately 1:57 p.m.[6]

20.     On the same date, I conducted a Marquis Reagent field test on a sample taken from one of the pills sold to the UC by COSTELLO which tested positive for the presence of Amphetamine/methamphetamine. The pills were orange in color, oval shaped, uniform in size, and stamped with a "b" over the number "974" on one side and the number "3|0" on the other side. A web search of these markings revealed a match on webmd.com for the generic brand name Dextroamphetamine-Amphetamine commonly branded as Adderall. Adderall has a registered trademark and is controlled under Schedule II of the Controlled Substances Act.

21.     The combined weight of the pills was more than 330 grams. Three (3) pills were separated and packaged for lab analysis to confirm the presence of controlled substance(s).

22.     On April 7, 2021, I received Laboratory Report number NY20210189, from the U.S. Customs and Border Protection (CBP) Laboratories and Scientific Services Directorate (LSSD), which describes the sample submitted from the January 13th, 2021, seizure as "three (3) orange-in-color oblong tablets with darker orange-in-color and white-in-color specks mixed throughout. All three (3) tablets were whole/not broken. All three (3) tablets were marked "3|0" on one (1) side and "b 974" on the opposing side." According to the report, all three pills contain methamphetamine, which is a Schedule II controlled substance under 21 C.F.R. Part 1308.

---

[5] One white pill was found in their left pocket which CW1 stated was their prescription. The pill did not match the physical description of the seized Adderall/Meth pills. During follow-up questions regarding the pill CW1 stated it was their prescription of Gabapentin.

[6] COSTELLO was not surveilled before or after the transaction.

23.     Based on the results from the CBP LSSD indicating that the pills submitted for lab analysis contained methamphetamine, I believe that the pills purchased from COSTELLO are counterfeit and not authentic Adderall pills.  Adderall contains amphetamine not methamphetamine.[7]

## COSTELLO's Ongoing Purchases of Materials Used to Make Counterfeit Pills

25.     On February 26, 2021, I received information from HSI        that on December 16, 2020, John COSTELLO received an order from TabletbinderTDP.c... .... to 826 WILLARD ST, APT 205, QUINCY, MA.[9]  The tracking number for this package was listed as 781343527975.  FedEx Tracking details for this package indicate that it weighed approximately 50 pounds.

26.     On September 8, 2021, I received additional information from HSI        vhich stated that John COSTELLO received another package sent to 826 WILLARD ST, APT 205, QUINCY, MA from TabletbinderTDP.com.  The tracking number for this package was listed as

---

[7] *See, e.g,* Webmd.com article "Adderall vs. Methamphetamine: Why They're Similar, and Why They're Not"  https://www.webmd.com/connect-to-care/addiction-treatment-recovery/methamphetamine/adderall-versus-methamphetamine (last visited October 27, 2021).

[8] "Binders" are substances that hold the ingredients of pills together in tablet form.

[9] The address, 826 Willard St, apartment 205, in Quincy, MA is the address listed on COSTELLO's driver's license as both his residential and mailing address.

281912585088.  Tracking details for this package indicate that it weighed over 20 pounds and shows that it was delivered on July 31, 2021.

27.      Agents believe that these orders were for pill binder powder.  As noted, pill binder powder is used in the manufacture of counterfeit pills, such as those COSTELLO sold to an undercover agent in January 2021.

28.      First, the name of the site is "tabletbindertdp.com."  I believe that it is most likely that a person navigating to a site with "tablet binder" in the name, either knew of the site or was directed to that site after searching for tablet binders.

29.      Second, the weight of the orders appears to be more consistent with an order of pill binder materials based upon a review of the materials that can be purchased through the site. In this regard, agents have reviewed the site "TabletbinderTDP.com."  The site appears to have a limited number of items for sale, including (1) colored and non-colored ready mix binder powder; (2) Ginkgo biloba; (3) green tea extract; (4) premium-colored mixes; (5) raw colors for mixing; and (6) tableting excipients and ingredients.

30.      I have reviewed the weights of the items for sale on the website.  Based on the approximate weights of the packages delivered to COSTELLO, I believe that the weight of the above noted orders demonstrate that the orders more likely involved ready mix pill binder powder.  In this regard, the site lists 10kg of ready mix tablet binder as 22lbs and 25kg as 54lbs.[10]

---

[10] In contrast, for example, Ginkgo biloba and green tea extract are available for sale in the amount of 100 grams, 250 grams, 500 grams and 1 kilogram.   While it is possible to order twenty or fifty pounds of these materials, I believe it more likely that COSTELLO purchased a single order of pill binder in the amount available on the site.

31.     The website states that the product is "The industry standard in pill binders and excipients. Pure Pharmaceutical Grade Ready Mix Tablet Binder. Ready to Press!" and describes it as a "Mixture of Grade Silicified Microcrystalline Cellulose Binder. Truly the best on the market. Product comes out hard and shiny for a professional look. All inclusive Microcrystalline Cellulose Ready mix tablet binder."

32.     Finally, in support of the conclusion that these purchases involved tablet binder, rather than some other product, I considered the fact that COSTELLO sold 1,000 counterfeit pills to an undercover law enforcement officer during a controlled purchase in January 2021 and various statements made by COSTELLO in communications with CW1, *i.e.*, that $3,000.00 is the price he pays for 1,000 pills so he won't sell them for that because it does him absolutely nothing, he gets it [pills] for that [price] and he said "I'm not gonna do it for free" in reference to selling pills to CW1 and the UC. COSTELLO has also stated that he wants to do this as little as possible and that he's trying to get three or four decent sized ones and that's it (presumably he was referring to selling pills to only three or four customers) he also stated that he does not want to deal with 20 people anymore (indicating that he has sold or supplied pills to that many people before). COSTELLO has stated that [Fred DECHRISTOFORO] has it down to a science, and he's got the coloration (this is in reference to the quality of the counterfeit Adderall pills) and that COSTELLO also agreed that he thought Fred [DECHRISTOFORO] has made a few million dollars off the pills.

## Surveillance at 826 Willard St

33.     Surveillance has identified John COSTELLO's car at 826 Willard St, in Quincy, MA on multiple occasions including the following:

34.     On October 5, 2021, SA Cianciolo observed a gray Honda sedan bearing MA license plate "2PWD74" (hereafter COSTELLO's Car)[11] parked outside of 826 Willard St in Quincy, MA.

35.     On October 7, 2021, at approximately 11:00 am, SA Cianciolo and I observed a male believed to be John COSTELLO, arrive at 826 Willard St in Quincy, MA, in COSTELLO's Car.

36.     On October 8, 2021, at approximately 11:40 am, COSTELLO's Car arrived at 826 Willard St, in Quincy, MA, the driver was a male believed to be COSTELLO.

37.     On October 12, 2021, at approximately 1:15 pm, I observed COSTELLO's Car arrive at 826 Willard St.  The driver, believed to be COSTELLO, remained in the car for approximately 16 minutes before walking into 826 Willard St.

38.     On October 14, 2021, Supervisory Special Agent Patrick Cunningham observed COSTELLOs Car at 826 Willard St at approximately 10:22 am.

39.     On October 15, 2021, at approximately 11:47 am, I observed COSTELLOs Car arrive at 826 Willard St.  The driver, suspected to be COSTELLO, remained in the vehicle until approximately 12:19 pm and then got out of the vehicle and walked into 826 Willard St.

### Proffer of Cooperating Witness 2

40.     Cooperating Witness 2 ("CW2") [12]

        distribution of controlled substances based upon a series of controlled purchases of suspected methamphetamine-laced pills that were being represented as Adderall (lab results are

---

[11] As noted above, the license plate is registered to John K COSTELLO of 826 Willard St, Apt 205, Quincy, MA, and this is the car COSTELLO used in January 2021 when he sold counterfeit Adderall pills to an undercover law enforcement officer at the Whole Foods in Hingham, MA.

pending).  Those purchases occurred from January 2021 through June 2021.

41.

CW2 described their narcotic distribution activities and stated they began by selling steroids and then started selling drugs for Fred DECHRISTOFORO.  CW2 stated that they are friends with Fred DECHRISTOFORO, and that DECHRISTOFORO is involved with percs (Percocet), Adderall 30s, Testosterone, and Anabolic steroids.

42.    As relevant to this matter, during the proffer, CW2 described an apartment where they received drugs from DECRISTOFORO.  CW2 did not state the exact street address but stated the location was in Braintree past the Ethan Allen store.

43.    I believe the location that CW2 was referring to in this proffer is the residence of COSTELLO, who resides in the Rosecliff Apartments on Willard Street in Quincy.[14]  Although CW2 stated the apartment was in Braintree, based upon a review of Ethan Allen's website store locator, the only Ethan Allen store location within miles of Braintree, is in Quincy on Willard Street (though that location is near the town line with Braintree).  The Rosecliff Apartments, where COSTELLO resides, are also on Willard St and adjacent to the Ethan Allen store at 840 Willard St, Quincy, MA 02169.

## Drug Traffickers' Use of Residences Generally

44.    Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences and

---

[14] 826 Willard St, Apartment 205, Quincy, MA, is the apartment at the Rosecliff Apartments which is rented in John COSTELLOs name.

vehicles of drug-traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' residences and vehicles:

    a.  Controlled substances.

    b.  Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, pill presses, pill binder materials, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

    c.  Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

    d.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

    e.  Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

    f.  Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

    g.  Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Location. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

13

h. Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

i. Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

45.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences and vehicles records relating to their drug trafficking activities. Drug traffickers store records of their drug dealing in their vehicles because they typically use their vehicles as a place of business both to receive and transport drugs and drug proceeds.

46.    Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

14

47.     Even when drug dealers store their drugs outside their residences, I know that they often will keep records relating to these off-site storage locations at their primary residence and/or their vehicle.  Such documents include rental or storage property agreements and receipts.

48.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for traffickers to conceal, at their residences or locations of operations, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances. Drug traffickers also typically transport money to purchase controlled substances or drug proceeds in their vehicles.

49.     Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds.  Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals.  In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

50.     During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises or subject vehicle.  It is common for drug traffickers to reside in locations that have utilities subscribed to in the names of friends, relatives, and/or significant

15

others. This is done in an effort to thwart law enforcement detection. Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offenses. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping. Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility. For example, a person involved in the trade of controlled substances is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills. These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

51.     Based on my training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators. In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication, drug traffickers typically keep the phones in close proximity, on their persons, or at their residences. Additionally, in my experience, many drug traffickers do not dispose of their cellular telephones when getting a new number, but instead just store or discard them in

various locations in their residences.  As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug traffickers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug traffickers' residences.

52.     Based upon my knowledge, training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "landline" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.  Based on my training and experience, I know that many cellular telephones have the capabilities described above.

53.     Seizure of devices containing the information detailed in this affidavit and in the materials to be seized will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell controlled substances typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate

both via both voice calls and via email and/or text messaging. I also know that drug traffickers regularly keep records of their illegal activities on cellular devices. These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers. Individuals engaged in drug trafficking activities often take photographs of their closest confederates and/or their product. Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone. From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store such records on their cellular telephones.

54.     Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via telephone, text messages, and the internet. I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online. Additionally, many cellular phones today have a GPS navigation device on the phone. Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals. Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

55.     Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards. I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

   a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.
   b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.
   c. Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.   This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.   It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.
   d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

56.     I know from my training and experience, that many cellular telephones now offer their users the ability to unlock the device via the use of a fingerprint in lieu of a numeric or alphanumeric passcode or password. This feature is called a biometric lock.

57.     If a user enables the biometric lock, he or she can register fingerprint(s) that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock

the device by pressing the relevant finger(s) to the device's fingerprint sensor. In my training and experience, users of biometric locks often enable it because it is considered to be a more convenient way to unlock the device than by entering a passcode, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

58.     In some circumstances, a fingerprint cannot be used to unlock a device that has a biometric lock enabled, and a passcode must be used instead. For example, if the device has not been unlocked for a period of time, or due to a periodic requirement to use the passcode. Thus, in the event law enforcement encounters a locked smartphone device, the opportunity to unlock the device via the fingerprint sensor exists only for a short time. A biometric lock may also not work to unlock the device if for example, (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) several unsuccessful attempts to unlock the device are made.

59.     I am also aware that even more recent smartphone devices no longer use a biometric lock and instead use a facial recognition security feature. Facial recognition systems use the smartphone's camera to scan the face of the user and, if the scan matches the data on file, performs actions like unlocking the smartphone.

60.     The passcodes that would unlock any devices that may be recovered are not known to law enforcement. Thus, it may be necessary to press the fingers of the user of the device to the device's fingerprint sensor or use the device's camera to access the facial recognition security feature in an attempt to unlock the device for the purpose of executing the search authorized by these warrants. Attempting to unlock the device with the use of the

fingerprints of the user or use the device's camera and take a scan of the user is necessary because the government may not otherwise be able to access the data contained on the device for the purpose of executing the search authorized by these warrants.

**CONCLUSION**

61.     Based upon the evidence set forth above, as well as my knowledge, training and experience, I submit that there is probable cause to believe that COSTELLO has committed violations of the Target Offense.  Accordingly, I respectfully request that a criminal complaint and arrest warrant be issued for COSTELLO.

62.     Based upon the evidence set forth above, as well as my knowledge, training and experience, I submit that there is probable cause to believe that at the Target Location, as described in Attachment A or on the person of COSTELLO, there exist evidence, fruits, and instrumentalities of drug distribution activities as set forth in Attachment B.

63.     Disclosure of the contents of the applications, affidavit, and search warrants could compromise and jeopardize this ongoing investigation, including the government's ability to arrest the defendant.  For that reason, I request that the applications, affidavit, and all related paperwork and orders of this Court be sealed until further order of the Court.



Respectfully submitted,

Cormac Frost, Special Agent
Homeland Security Investigations

Subscribed and sworn before me on November 1, 2021.

Hon. Marianne B. Bowler
United States Magistrate Judge

21

## Attachment A

<u>Premises to be Searched—Subject Premises</u>

The premises to be searched (the "Subject Premises") are described as follows, and include all locked and closed containers and electronic devices found therein:

- 826 Willard St in Quincy, Ma, is a multi-level multi-unit apartment building identified by the black and white sign above the brick entry area near the middle of the building. The building has a light tan/yellow siding with white trim. The first level is a brick exterior which covers a drive through parking garage. The Subject Premises is apartment 205, from the elevator on the second floor turn left and the apartment is on the right. The number 205 is under a light to the left of the apartment door. Apartment 205 is the only apartment known by agents to have two deadbolt locks.



## Attachment B

### I.  Items to be seized

**All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841 (possession with intent to distribute controlled substances) (the "Target Offense"):**

1.      Illegal controlled substances, including but not limited to, methamphetamine, and prescription pills.

2.      Items associated with the manufacturing of pills including but not limited to pill binder powder, presses, and other machines used to manufacture pills.

3.      Paraphernalia for packaging and distributing controlled substances, including but not limited to, plastic bags and scales.

4.      Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

5.      Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, photographs, telephone address books; planners; notes; and ledgers.

6.      Cash, currency, and records relating to drug trafficking activity income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; monetary notes; registrations; purchase or sales invoices; and bank records.

7.      Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

8.    Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

9.    Items of personal property that tend to identify the person(s) in control, or ownership of vehicles.  Such identification evidence is typical of the articles people commonly maintain in their vehicles, such as mail, registration documents, vehicle maintenance receipts, bank receipts, credit card receipts, identification documents, and keys.

10.    Cellular telephones, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

   a.    Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

   b.    Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c.    Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

   d.    Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   e.    GPS data;

   f.    Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   g.    Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   h.    All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

   i.    Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.